Good morning ladies and gentlemen. Our first case for this morning will be Thomas Simstad against Gerald Scheub and others. Mr. Sutherland. Good morning. If it pleases the court, my name is Michael Sutherland. I am representing the plaintiffs, Tom and Marla Simstad. Tom and Marla Simstad have been successful developers of residential properties in Lake County for over 30 years. Deer Ridge South was to be their best and most unique residential property. Instead, it was their last. With experience in developing residential properties, Tom developed over 600 lots and he himself was a member, formerly, of the Lake County Plan Commission. So he knew the ordinance, subdivision ordinance, backwards and forwards. Could I ask you sort of a practical question to start with? When I looked at the entire history of this case, and in particular the settlement that happened after the state court proceedings, it looked to me as though this actually boils down to about two months that you're complaining about. Is that correct or not? Two months that we're complaining about as to what, Judge? The delay in moving forward because this, as I understand it, the proposal for this subdivision is first submitted by Mr. Baczkorski in October 2004 and it's approximately two years later, October 2006, that the Commission eventually approves it, that there was some discussion about whether that should have been August or so of 2006, but not very much difference. No, that's not correct, Judge. In our complaint, the Simsteads alleged that the improprieties and the unjustified delays and conflicts that were placed upon them to justify changes in the plan resulted in this undue delay and the unlawful anonymous that was the basis for these delays was clearly made clear in the record. Were claims to this effect made in the state court litigation? No, the state court did not have any jurisdiction to talk about delays. That was simply the petition for cert to review and compel the approval to go forward, but the approval should have been granted back in 2004, perhaps 2005 at the latest, so the state court jurisdiction does not address any of the damages that would be suffered by the delay and in this case the damages were the basis were caused by the unlawful anonymous of Mr. Ken Pachorski, I'm sorry, Ken Kavosevich, Ned Kavosevich and Jerry Hsu. So when you look at the history of this and the experience of the Simsteads, they knew exactly what the process was and they knew the requirements of the ordinance and they satisfied all those. In fact, the first submission should have been approved without any debate whatsoever, but the defendants, Ned Kavosevich and the others, under the influence of Mr. Hsu, kept placing additional requirements or changing the requirements and then switching back and withdrawing their support once they imposed these requirements. So if you look at the long history, the delay is based upon their dishonest and unscrupulous behavior and the false reports of Mr. Ned Kavosevich to the to the plan commission. So the original rejection of the plan of Deer Ridge South was based upon the staff reports. The staff report was dishonest and unscrupulous and every one of the... Well, you're saying that, but I mean the staff is looking at things like whether there should be a single entry or dual entry. They look like typical zoning things, you know, land development things. Well, they are issues of simple zoning, but if the petitioner for a subdivision satisfies the ordinance, it is not discretionary on the staff to start imposing additional requirements or to changing the requirements. Otherwise, there'd be no point in having an ordinance if it could be willy-nilly moved around and say, well, we did require this, but now we're changing it to one entry. So if there was a problem, it I realize that you've pleaded class of one and I'm not really even clear what you're saying about Mr. Kavosevich, because when I look at the transcript that you included, it sounded like you were trying to go after him for individual liability, except then you have this complicated argument that his state of mind was somehow attributed to the entire plan commission. Judge, I don't think it's complicated at all. It's a cat's paw theory. In other words... I can explain what you... Well, I would like to address that issue. We'll jump ahead a little bit here since you brought it up, but, you know, it's clear that the Seventh Circuit has applied the cat's paw theory primarily to employment law, but the Straub case, the Supreme Court case, there's no reason why it shouldn't be applied otherwise, and we have the Polaris case, which this court has recently decided, and that Polaris case addressed not only the summary judgment issue, but also the cat's paw theory, and jumping ahead a little bit, Judge, if you look at the court's decision to dismiss the First Amendment claims under Trial Rule 50 and the equal protection claims because we did not produce enough, provide enough evidence, and the court also was concerned about the seven years separation between the alleged original political retaliation and the later retaliation, but we've explained that, and that's on the record. I mean, most telling was the jury was with us the whole time. The jury had questions, which are on the record, about over six and a half hours. Well, but let's, let's stick with the law here. I mean, we have, your theory is somehow this man, your theory is A, he harbored this animus. B, he somehow was using the entire plan commission as his tool to implement this animus. It has to be the whole commission. It can't be, usually, forget about employment, usually a cat's paw theory involves one person manipulating a second person, and you can imagine that happening, but the entire commission, when people have all different kinds of reasons to vote as they do? Well, Judge, but that, I disagree. The cat's paw theory applies subordinate person having an unlawful animus influencing the decision-making person or I think that's implied the decision-maker. It doesn't say. It doesn't say body, but that is the decision-making body. We know that in Smith against Bray, that maybe the theory supported entity liability in Title VII, except perhaps when the defendant is a municipal corporation. Well, this is the case, it seems to me, that the court will have to address whether or not the cat's paw theory should be expanded to municipal liability. I mean, if you don't want to do that. We don't have to decide that if we don't think there's enough evidence anyway. Well, I know, but this is a case where the court can do that, because we clearly, I believe, established enough evidence. In other words, let me go back to the original arguments that we made in our briefs. That is, we had a stated claim, we had admissions, we had an amended complaint was not addressed, so the first thing we raised as a legal issue was whether or not the court abused its discretion in granting leave of the defendants. They had five attorneys there under Rule 6 and 36. The court had a duty to impose upon the defendant's counsel to demonstrate why they were so negligent or incompetent. But what the court also says, if you look at his order, is he says he doesn't want to impose a disproportionate sanction, which would essentially, in effect, be entering judgment for you for this set of circumstances. He says it's better to decide cases on the merits, I'm going to give you an extra year for discovery, and frankly, looking at the litigation timeline in this case, I think there's a lot of blame to go around in a lot of directions. The district court sat on that first motion to dismiss for an unconscionably long period of time. I made note of that, but see we have . . . Why should that be a windfall for you? Well, that is not what we're complaining about. We're complaining about them being asleep at the switch, all five of them, when this court finally decided and raised the stay on discovery. But you waited a long time, too, to bring that to the court's attention. I don't have a duty to bring it to the court's attention. Well, maybe the court thought that you were not coming with entirely clean hands when you could have sped things along yourself. Judge, I have to follow the rules, just like the defendants do, and the rules require . . . they don't require the court to bring it to the defendant's attention, nor the defendant to look at the docket entry, and he wouldn't do it. He first said there was no discovery served. How can he say that as an officer of the court when he hasn't even looked at the docket? The second time she brings it to his attention, after he had to withdraw that statement, he says, well, we don't need any discovery. We're ready to go to trial. I just want to know why we should find that the only choice the district court had that was acceptable was to refuse to allow that answer to be filed, and more importantly, to reject, under Rule 36, this overly large number of requests for admission that you had filed. Well, the overly large requests for admissions was granted and approved. That was not simply . . . But then there's a provision in Rule 36 for relieving somebody of that, and the district court said, I have discretion to do this, and I think that's the right thing to do here. But the court . . . You think he had no discretion? No, I encourage the court to look at and examine the, quote, reasons given and to see whether it's justifiable. In other words, there has to be more than say, well, it's an oversight. The court actually talked about this in Keiler versus Moji just fairly recently, and in that case, they looked at the incompetence of Mr. LaFara, and they focused primarily on his incompetence rather than on the undue consequence of the . . . I don't know what you're referring to as they. The decision in Keiler held that the district court had not abused its discretion. You would be on firmer ground if you found a case where we had held that the district court had abused its discretion by allowing an untimely answer or an untimely response to a request for admissions. Yeah, but it seems to me I am on sound ground. Do you have such a case? I do not have such a case, but in this particular case, the examination was to see whether or not the abuse of discretion was applied. Well, and it was. I mean, the district court maybe didn't discuss as many things as you might have liked, but he clearly recognizes that he has some discretion over this effort to bring this case back to life, and he explains that the remedies of imposing the old admissions and refusing the answer, in his view, were very disproportionate to the problem at hand. He thought he could get the case moving forward. The federal rules and the law prefers decisions on the merits as opposed to simply as sanctions for behavior, and he tries to fix the situation, so, you know, by giving the extra discovery only for the plaintiffs. So you're arguing that those he had no authority to take those actions, and we're trying to figure out under what other earlier case or under what theory is that true? Judge, he had the authority, clearly, to consider those requests to allow a belated answer to be filed. But you're saying he exercised, no, you're actually saying that under these circumstances, the choice to do what he did was impermissible. It was, that's true, because he didn't, it was his opinion. In other words, his opinion has to be more than based upon, I guess, reading the rule and say, hey, let's make this go to trial. He has to examine, otherwise the lawyers are, there's no sanctions, there would be no control over the process of getting a case to trial. In this case, we did not have an obligation to bring to the defendant's attention or the court's attention, but we did. But you didn't propose any kind of remedy other than we win. You know, there could have been cost shifting for extra discovery, there could have been other things. Judge, this is not a default judgment. They were gonna have their trial. With all of these 136 or whatever the number was, admissions. Then they can explain those. I mean, isn't that what admissions are for? And isn't the, you have five lawyers here. I'm trying to find out why the court wants to excuse five lawyers from not doing their job and punish the plaintiffs who have followed the rules implicitly. There's no unclean hands here. Well, the district court didn't think he was punishing you. He was giving you an extra, whatever it was, 11 months or so to take whatever additional discovery you want. I realized somebody died, you know, these things happen. But the district court was trying to, to the best of his ability, reset the clock so that this case could actually be resolved. But I don't think he thought of that as punishing you any more than punishing anybody else. I think when you reset the clock after three years or four years or five years, seven years in this case, that is punishing the, five plaintiffs. And every time we did a deposition and every time we asked one of the board members or the witnesses, their standard response was, you know, that was a long time ago. I'm gonna have trouble recalling that. I really don't know. And as Mr. Rumsfeld famously said, we have the unknowns and we have the unknown unknowns. So in this case, when a plaintiff is getting ready to go to trial, he has to dig up witnesses that have moved away, have retired, and in this case we had one person die. So when you're trying to resurrect a case that was going to rely upon the failure of the defendants to answer an amended complaint, and there's nothing wrong, there's nothing unethical, there's nothing unprofessional about doing that, and rely upon their failure to answer admissions, that's our strategy. Well, but would you agree, I mean, my view of this record or what I understand is that it was December 3, 2010, that the magistrate judge established a discovery schedule. I'm still trying to figure out why there was so much prejudice and why what the judge was doing wasn't really just making the best he could of a bad situation. Maybe I wouldn't have done that, maybe you wouldn't, but why was it wrong, reversible error? Well, I'm trying to, if we had admissions that were outstanding and we had requests for and we had an opportunity to say, we want those things answered, or we have an opportunity to say, I'm going to rely upon your failure to answer those because that's what the rules say and that's the sanction, I might just chose as a competent attorney, I'm acting on behalf of my client, to not bring it to their attention. In fact, I have a duty not to bring it to their attention or I might be guilty of malpractice if I start helping the other side with their case. Well, that's a very strange argument because you see the consequence of not Well, isn't that what you did in Moji? You had one sanction, you kept the judgment. Moji affirmed a decision of the district court by ruling that the judge had not abused his discretion. As I said earlier, you need to demonstrate that the district judge did abuse his discretion and if you had some authority for your proposition, that might help, but in response to my question, you conceded that you had none. Yeah, that's true, but if you look... You made an argument to the district court, the district judge rejected it, he had discretion, and now you have the same uphill battle that the appellant in Moji had, to show that the district judge had taken leave of his senses, and that's a very hard fight to win. Well, it may be, but I'm not accusing the judge of taking leave of his senses. That's what abuse of discretion means. But when you have, in the Moji case, you have a clear record, the Mr. Moji did not do. He went through the whole history. We have no such record in this case. We have no examination by the court of what Mr. Overholt did or any of the other lawyers did. No, we understand. You're treating Moji as though it's kind of a roadmap for when discretion is abused or not, but actually looking at the broad run of cases, there are all sorts of ways. If you would like to save any rebuttal time, I will alert you. You're into it. It's up to you to use it or not, as you wish. Thank you, Judge. I would save the remainder of my time for rebuttal. Okay. Mr. Overholt. Good morning. Tony Overholt here, representing the defendants this morning. In its decision in Pioneer Investment Services, the Supreme Court held that the decision about whether a party has shown good cause or excusable neglect is to a great extent an equitable determination. It is indeed, but I have to say that it's disturbing to see on this record nothing about the excusable part. The neglect is plain, but why was it excusable? We established a bar for that in cases like Prisvoit's and it's excusable. And one of the things the plaintiff said in his briefs to this court was that the court offered an excuse for defendants counsel even though none was found in their motion or brief, but that's factually incorrect. In fact, an explanation for those manners was contained in the briefing on the motion to file a belated answer and to set aside the request for admissions. Specifically, docket 166 contains a discussion of delay. The confusion created by the change in counsel is discussed at docket 169. Delay is further addressed in docket 170. So why is confusion caused by change of counsel something that should be the plaintiff's problem? I mean, this is civil litigation. We don't have criminal concerns here. It's counsel's responsibility to pass the baton in some understandable way. I think that's generally true, but again, whether the process was specifically followed in this case and whether the district court as an equitable matter found that the appropriate remedy was what he found, again, that's an abuse of discretion. And I don't believe the district court abused its discretion in fashioning the remedy it did. Again, what the district court effectively did is require me as the attorney who was hired sort of late in the game to come in and try this case to a jury for eight days without having the opportunity to depose the plaintiffs or their witnesses. So, I don't want the district court or this court to believe that somehow the defendants weren't penalized in any way. They were. Trying this case without that opportunity was very challenging. But that's the remedy that was fashioned. There was just huge neglect of this case from start to finish, or at least in several big gaps. For example, from April 21st, 2008 to the discovery schedule in 2010 to the middle of March 2013. I mean, this is not desirable. I think on both sides, this case was not given the attention it should have received. I think that's absolutely correct. And again, the district court tried to address the situation as best it could and fashion a remedy that was appropriate for the circumstances. If I could, I'd like to address for a moment Plaintiff's assertion of the application of the cat's paw theory in this case. Quite frankly, I find myself at a loss to understand the plaintiff's position. He has asked this court to take this case and say, through application of a cat's paw theory, that respondeat superior should now apply in a Monocase. I don't think that's quite what he's saying, although I do find his brief confusing. Here's a hypothetical. This may not be this case, but let's just make it a hypothetical. Suppose some person, like an executive director, just has it out. Maybe even I'll throw into the hypothetical for an impermissible reason, maybe racial or religious or something, for a particular developer. And so that person prepares a package of documents. It's gonna go to every single one of the nine plan commissioners that has essentially bogus information, and it claims all sorts of violations of the ordinance, and engineering studies haven't worked out, and this and that haven't worked out. So the plan commissioners are used to relying on the package of information from this secretly biased individual, and they look at this and they say, well, this project doesn't satisfy anything in the ordinance, and they accordingly vote against it. I think what he's saying, he's not... Whether he thinks so or not, this isn't actually a lawsuit against the biased person. This would be a claim that the plan commissioners made their decision for impermissible reasons, even though they didn't know it. They were being used by this person. So that's the closest I can come to imagining how the so called cat's paw theory might work here. But that's contrary to Monell, because Monell specifically says liability cannot be imposed upon a municipality because of the acts of an employee towards the... But it wouldn't be. In my hypothetical, it's the plan commission, which we all agree is the final decision maker for this purpose. It's the municipality. Yes. So it's the plan commission that has, by its action of denying, taken some step, implemented a policy. So it's at that level that you would do this. It's just that they're fed bad information that causes them to do this, and that's why I'm trying to keep Mr. Kovacevic out of this, because I just don't think you can get to him if you're trying to have a Monell case. He's not in any way, shape or form the plan commission or Lake County or anybody else. But if he taints the ultimate decision of the ultimate decision maker, do we have a theory for liability against, on a Monell theory, the plan commission itself? I think the answer to that is no, because the Supreme Court said in an intentional constitutional tort, there must be a ratification or acceptance of the bad motive. So the question is, what does that mean? Because they have accepted the bad motive by their action. But not intentionally. They have... But then the question is, can you impute to their minds, their collective mind, if you will? Of course, you have all sorts of issues about figuring out what a collective mind is thinking. And so, we'll get to... Well, he's placing the court too. Maybe get to that in a minute. But that's the idea. And I don't see anything in either Monell or any other cases that say that's impossible, but I don't see any case that's done that either. I think the closest this court has come to addressing this precise question is Smith versus Bray, where the court said, when you are dealing with other kinds of statutes that work more in an agency model like Stroud. So if you're talking about USERA or Title II, ADA, that sort of a theory works. But the court in Smith versus Bray specifically carved out Monell claims. Not with the ruling, though. We just said, except perhaps. So in other words, saying, we'll decide this another day. We don't have to decide it in Smith versus Bray. So we did flag it as an issue. No doubt about that. I don't think... Here's how the court in the past has reconciled this principle. If you go back to Felton versus Board of Commissioners, the court has said that a claim such as has been brought here can succeed against the municipality if the plaintiff can establish that there was intent, discriminatory intent, by a majority of the board. And in that particular case, in Felton, in fact, the plaintiff was successful. The plaintiff was able to establish that there was actual intent, there was acceptance of the discriminatory motive by the municipality, by the decision maker as an entity. Here, that was the same burden that the plaintiff had. He had to establish that a majority of the board, five of the nine, accepted the motive. The problem is he failed in establishing that evidence. One of the questions... And why did he fail? Is your primary argument that there isn't even enough evidence that Mr. Kavacevich had the impermissible motive, or is your primary argument that he didn't sway the five of the nine plan commission members? I don't believe there's enough evidence to show that Mr. Kavacevich acted with improper motive, but even accepting, for purposes of argument, that he did. Things like the statement... When did he make that statement, you're never gonna get another plan? In 1996, when Mr. Kavacevich was, I believe, an assistant director of the Plaintiff Commission. He had a meeting with Mr. Simstad and another witness, but intervening in that time period... That's the meeting where people start shouting at each other in the middle, and then they calm down. Then they calm down, and then about a year or so later, Mr. Simstad asks Mr. Kavacevich to present his plan to the Plaintiff Commission on his behalf, because Mr. Simstad is ill. And we're still in the 90s at this point, right? Yes. Yes. And that's in, I believe, 1997. And the plan gets approved. Not only that, but we have Mr. Shube voting to approve many of the same kinds of waivers that are being sought in this case. So you have this time period from 1996 to 2005, where everything's fine. I just don't see how they overcome that, especially when Mr. Simstad, on cross examination, was asked specifically by me, what evidence do you have that the individual board members who voted on that plan commission were voting against you because of some bad reason? And he said he had none. And he didn't. In fact, that's confirmed by another point in the record. In May of 2005, when this was initially brought to the board, it was brought by Ken Pajorski. And there is zero evidence in this record that anyone on that plan commission or that Ned Kavacevich knew that the Simstads were connected to this development. Well, how can there be bad motive? How can it be animus if they didn't even know they were involved and they made a decision completely independent based upon the actual facts of the development? I mean, it just doesn't make any sense. So when, in your view, does the record contain the first hint that that link between the Simstads and Pajorski existed? In the record. I remember they were trying to groom Pajorski as their successor. They're gonna move to New Mexico or Arizona or some place. That's right. What they tried to do is make him the successor. And the record established through the examination of Mr. Pajorski and Mr. Simstad, that they had Mr. Pajorski sign all the documents, make all the appearances in front of the plan commission, and be the face of the development. So when the development was first being considered in May of 2005, Mr. Kavacevich and all the members of the plan commission knew only that Ken Pajorski was involved. That's all they knew. There was no evidence, as admitted by Mr. Simstad on his cross examination, there was no evidence that anyone on that plan commission knew they were involved. And on the basis of Mr. Pajorski's presentation, they determined that the plan did not meet the requirements of the ordinance. Because it didn't meet the requirements of the ordinance, they made a written request for four waivers. The plan commission has an enormous amount of waiver, because the waiver... Well, excuse me, I'm sorry to interrupt, but Mr. Sutherland seems to be saying that these four waivers themselves were really bogus. That the plan, in fact, complied with everything in the ordinance. Here's the simplest one to understand in terms of the waivers. The initial plan in May of 2005, it of course contains... There are architectural drawings and plans for the ordinance. One of the ordinance requirements says, you cannot have a cul de sac that's longer than 600 feet. That's what the ordinance says. Their first plan submitted in May of 2005 had a cul de sac in the plan that was 1,498 feet long. It violated the ordinance. In order to be able to build that subdivision, they had to get the plan commission to agree to waive that requirement. And the plan commission, in its discretion, said no. Now, I will admit that other waivers are a little bit more complicated, but that waiver cannot be any simpler. Again, the ordinance says 600 feet, and what they proposed was 1,500 feet long. So this notion that somehow all the arguments of the plan commission were bogus just doesn't make any sense. It's contrary to the evidence. I don't really have anything else to present at this time. I'm happy to answer any other questions the panel may have. It appears that we have no other questions, so thank you very much. Thank you. Anything further, Mr. Sutherland? Of course. I mean, you don't have to, but you're welcome. I think I have a few minutes. You do. How much? Three minutes. Three minutes. Okay. Let me just address the last one, and I'll go in reverse order. The cul de sac was required by the plan commission because their first proposal had two entrances. So then when they had the second proposal, they said, okay, we'll support that, but instead of supporting it, they changed their mind. That's just switch and bake. That's what was going on this whole time. Second, every board member we asked said, what did you base your decision on? And they said the staff report. So contrary to what Mr. O'Holt said, they did rely upon the staff report for making their decision. Every one of them said that. Every one of them we deposed said, I'm having trouble recalling all the incidences. So we don't have this issue. But that's not quite the same thing, as Mr. O'Holt points out, as saying that the members of the plan commission had some reason to push the Simstads out of the Lake County real estate market. No, I didn't think that the board in its entirety was intending on doing that. That was Mr. Shube's strategy, and he has... Well, you have to make it the board as its entirety, or you don't have a Monell claim. Well, that's true. We don't have a Monell claim, but we have the Casbah theory, if it was allowed, and the Casbah theory would imply the wrongful animus of Mr. Nedkovacevich to the entire board, and the board... But that's... No, I still think you're confusing these different theories. You have to get to some point where the board did something wrong. You agree that Mr. Shube didn't individually approve or disapprove or do anything. It was the board that took the final action. That's correct. So you've got to get to the board doing something wrong. Well, the board voted. That's what the Casbah theory is. It's like the decision in an employment case. If the decision maker doesn't even know the employee, they're simply looking at a form, he doesn't have to know who's behind the development. He's making a decision based upon the information he's given, and he's relying upon that entirely, as they did in this case, the staff report. Now, there were two... But, of course, there are agency theories that operate in Title VII that are quite different in the Monell context. Well, that's true, but we're not advancing a Monell claim. This is a theory in which the liability... So how can you hold the municipality liable at all if you can't satisfy Monell? Well, we can if you're talking about applying the Casbah theory, but we're not talking about... See, the other approach would be to hold Mr. Kibosiewicz liable, as we suggested, and then you have an indemnification issue, but he's not the decision maker. So without the Casbah theory, there is no way that Simsteads or anyone else applying for a permit, for a liquor license, for a barbershop license, for a gun permit, if that decision maker is more than one person under the court's previous one. For a federal claim, but you're forgetting that there may be remedies under state law if the planning commission has done something wrong. Well, that's true, but I'm just saying in this particular case, if you're talking about equal protection or First Amendment, suppose the person says you're not getting your liquor license because, you know what, you threw me out of your bar last year, and that's it. All right, you need to wrap up at this point. So we rely upon our brief, Your Honor, and we trust this court will give the Simsteads their day of justice. All right, thank you very much. The case will be taken under advisement.